# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 01-CV-6954 (JFB) (CLP)

————————————

JEFFREY BLAKE,

Plaintiff,

VERSUS

MICHAEL S. RACE, RICHARD BREW, DAVID CARBONE, AND PHILIP J. SAURMAN INDIVIDUALLY, AND JOHN DOES 1-10, POLICE OFFICERS AND SUPERVISORY OFFICERS OF THE NEW YORK CITY POLICE DEPARTMENT, INDIVIDUALLY, THE IDENTITY AND NUMBER OF WHOM IS PRESENTLY UKNOWN,

Defendants.

————————————

MEMORANDUM AND ORDER
March 29, 2007

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Jeffrey Blake ("Blake") filed the complaint in this action on October 19, 2001, against Sergeant Michael S. Race and Detectives Richard Brew, David Carbone, and Philip Saurman, and ten John Does[1] alleging

---

[1]As an initial matter, the Court dismisses the claims against the unnamed John Doe defendants. Though discovery is complete in this case, plaintiff has failed to identify any of the unnamed defendants, or to present any evidence demonstrating their involvement in the infringing activity. Moreover, plaintiff's opposition to defendants' motion for summary judgement does not specify the role of any unnamed defendants in

the infringing conduct, nor does plaintiff indicate that he will be able to identify these unnamed defendants in the future. *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd., v. Star Mark Mgmt., Inc.*, No. 04-CV-2293 (JFB) (SMG), 2007 WL 74304, at *5 (E.D.N.Y. Jan. 8, 2007). Accordingly, because "plaintiff [had] an opportunity to pursue discovery to identify the unknown defendants" but failed to do so, this Court adheres to the "general rule" that disfavors the use of "John Doe" to identify defendants. *Feliciano v. Cty. of Suffolk*, 419 F. Supp. 2d 302, 313 (E.D.N.Y. 2005) (quoting *Covington v. Warden of C-95*, No. 93 Civ.1958 (FB), 1996 WL 75211, at *4 (E.D.N.Y. Feb. 8, 1996)) (internal quotation marks omitted); accord *Murphy v. Goord*, 445 F. Supp. 2d 261, 266 (W.D.N.Y.

violations of his rights under 42 U.S.C. § 1983, as well as pendent state law claims.

The events underlying this lawsuit relate to Blake's arrest and conviction for a double homicide that occurred in Brooklyn, New York on June 18, 1990, during which approximately 50 rounds were fired from an automatic weapon into a moving car killing Everton Denny and Kenneth Felix. A police informant, Dana Garner, claimed to have seen the shooting and was the sole witness implicating Blake in the homicides. Garner testified at Blake's 1991 trial, at which Blake was convicted and sentenced to consecutive terms of imprisonment of 18 years to life. In 1998, after Blake had been incarcerated for over eight years, the Kings County District Attorney's Office joined in Blake's motion to vacate the conviction and dismiss the indictment because it had been determined that, contrary to his trial testimony, Garner had not witnessed the crime. Although the prosecutor did not take a position on Blake's actual innocence in consenting to the motion, he acknowledged that Garner's discredited testimony was the only identification evidence linking Blake to the crime. The State Supreme Court granted the joint motion on October 29, 1998, and the conviction was vacated and the indictment dismissed. Garner now claims that, prior to Blake's arrest, he was fed details regarding the homicides by the police and pressured by the police to falsely implicate Blake in the homicides. Defendants, who were police officers involved in the investigation and prosecution of Blake, categorically deny coaching or pressuring Garner in any way, or having any knowledge at the time of Blake's arrest or trial that Garner's information and testimony were false.

Defendants now move for summary judgment on all claims. In support of their motion, defendants argue, among other things, that no reasonable juror could believe the "conclusory allegations of a self-proclaimed perjurer" like Garner about police misconduct in Blake's arrest and prosecution. (Defs.' Mem. at 38.) Specifically, defendants outline the substantial impeachment material undermining Garner's credibility, including a conclusion by a district court judge in another proceeding in 2001 that Garner is "a witness who no longer cares about the truth or falsity of his testimony." *Ortega v. Duncan*, No. 00-CV-4726, 2001 WL 1152805, at *12 (E.D.N.Y. Sept. 20, 2001), *rev'd*, 333 F.3d 102 (2d Cir. 2003). Blake counters that the Court cannot resolve the issues regarding Garner's credibility on summary judgment and, in any event, asserts that there is evidence in the record to corroborate Garner's serious allegations of police misconduct in Blake's arrest and prosecution.

For the reasons discussed below, having carefully reviewed the record, the Court finds that this case cannot be resolved by way of summary judgment; rather, a jury will need to hear Garner's testimony and the other evidence in the record to resolve the issues of fact surrounding the drastically different version of events offered by the parties in this case as it relates to Blake's arrest and prosecution. Accordingly, with the exception of the abuse of process and negligent infliction of emotional distress claims, defendants' motion for summary judgment is denied.

_____

2006); *see also Kemper Inc. Co., Inc. v. Federal Exp. Corp.*, 115 F. Supp. 2d 116, 125 (D. Mass. 2000). Thus, the "John Doe" defendants are hereby dismissed without prejudice.

## I. Background

### A. Facts

The facts described below are taken from the parties' depositions, declarations, affidavits, exhibits and respective Local Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2001).

In June 1990, David Carbone ("Carbone"), Richard Brew ("Brew") and Philip Saurman ("Saurman") were Detectives assigned to the New York City Police Department's 75th Precinct Detective Squad ("75th PDS") located in the East New York section of Brooklyn, New York. (Defs.' 56.1 Stmt. ¶¶ 1, 3-4; Pl.'s 56.1 Stmt. ¶¶ 1, 2-4.)[2] In June 1990, Michael Race ("Race") was a Sergeant assigned to the 75th PDS. (Defs.' 56.1 ¶ 2; Pl.'s 56.1 Stmt. ¶ 2.) Race had been on the police force since 1973, was promoted to Sergeant in 1984, and joined the 75th PDS in 1985. (Race Dep. at 80-81.)

#### 1. The Denny/Felix Homicides

On June 18, 1990, at approximately 1:45 p.m., Police Officer Werner Ay ("Ay")

responded to an emergency radio call at the corner of Ashford Street and Dumont Avenue in Brooklyn, New York ("Crime Scene"), located within the confines of the 75th Precinct. (Defs.' 56.1 Stmt. ¶ 5.) Ay was the first officer to respond to the scene. (*Id.* ¶ 6.) Ay observed two males, who had been shot, inside a car. (*Id.* ¶ 7.) The driver's side window of the car was almost completely open and the passenger's side window was shot out. (*Id.*) Ay also observed shell casings from bullets that had been ejected from an automatic pistol around the area of the car. (*Id.* ¶ 8.) Ay called for Emergency Medical Services ("EMS"). (*Id.* ¶ 9.) The male in the driver's seat, later identified as Everton Denny, was still alive at the time and was taken to Brookdale Hospital, where he was later pronounced dead. (*Id.* ¶ 10; Pl.'s Exs. E, N.) EMS determined that the male in the passenger's seat, later identified as Kenneth Felix, a/k/a James Grant, was dead. (*Id.* ¶ 11.)

On that same day, at approximately 1:47 p.m., Carbone, who was assigned to what came to be known as the "Denny/Felix homicides," went to the Crime Scene in response to a radio call concerning two males who had been shot. (*Id.* ¶ 12.) Carbone observed a black male, Felix, in the passenger seat, suffering from multiple gun shot wounds. (*Id.* ¶ 13.) At approximately 2 p.m., accompanied by Detective Smith, Carbone followed Denny to Brookdale Hospital. (*Id.* ¶ 14, Pl.'s 56.1 Stmt. ¶ 12-14.)

Detectives Redmond and Hall canvassed the crime scene for witnesses. (Defs.' 56.1 Stmt. ¶ 15.) At approximately 2:45 p.m., Redmond interviewed Chris Celenti ("Celenti"), a foreman for Northern Electronics who was doing work on buildings near the area. (Pl.'s Ex. E.) According to the DD-5 prepared by Redmond, Celenti stated

---

[2] References to Defs.' 56.1 Statement are undisputed unless otherwise indicated. In plaintiff's response to defendants' 56.1 statement, plaintiff identifies a number of paragraphs as disputed, yet provides information consistent with those portions of defendants' 56.1 statement. Where plaintiff indicates that a fact is disputed, but repeats such factual information in its response, the Court will identify the relevant paragraphs of both parties' 56.1 statements.

that he heard what sounded like a tire blowing out and, when he looked out the window, he saw a car driving backward with a black male running next to the driver, shooting into the car. (*Id.*) Celenti described the perpetrator as a slim black male with short hair, wearing a green t-shirt and tan pants. (*Id.*) Carbone and Race reviewed Redmond's DD-5. (Carbone Dep. at 178; Race Dep. at 222-223.)

NYPD's Crime Scene Unit ("CSU"), which had been called to the scene at approximately 2:00 p.m., arrived at the scene at approximately 3:30 p.m. (Defs.' 56.1 Stmt. ¶ 16.) CSU did not discover a weapon at the crime scene, but CSU did recover fourteen shell casings and six deformed lead bullets, all of which were vouchered by Ay. (*Id.* ¶ 17.) According to CSU, the shells were all fired from the same gun, "NCCII, manufacturing designation, .9 millimeter Lugar W," and the shooter, following the car, had fired at the passenger side of the car as it was backing up.[3] (*Id.* ¶ 18; Blake Trial Tr. at 291-292.)

### 2. The Diaz Homicide[4]

On June 25, 1990, at approximately 3:50 a.m., on Livonia Avenue and Hendrix Street in the confines of the 75th Precinct in Brooklyn, Lionel Diaz, Angel Narvaez, and Ricardo Betances were approached by three armed men and Diaz, Narvaez, and Betances were shot with a shotgun by one of the men. Diaz died, but Narvaez and Betances survived. (Pl.'s Ex. KK.)

### 3. Dana Garner Speaks with Police

On June 25, 1990, at approximately 2:00 p.m., Dana Garner ("Garner") went to the 75th PDS and met with Saurman for approximately thirty minutes while Saurman interviewed Garner and took a written statement. (Defs.' 56.1 Stmt. ¶ 19.) This interview occurred in the interview room, which adjoins the main detective squad room. (*Id.* ¶ 20.)

The events surrounding Garner's statements during this interview are one of the main points of contention in this case.

---

[3] According to Blake, the conclusion by CSU, that the shots were fired into the passenger side of the car, was contradicted by other evidence. In particular, Blake points to (1) the testimony of eyewitness Celenti to the shooting who stated he saw the shooter fire into the driver's side (Pl.'s Ex. E), and (2) the medical examiner's opinion that the bullets came from the victims' left side, which is consistent with a shooter on the driver's side. (Blake 440 Tr. at 5-6; Blake Trial Tr. at 298.)

[4] Although the Diaz homicide is an entirely separate crime that occurred in the 75th Precinct one week after the Denny/Felix homicides and Blake was never charged in connection with the Diaz homicide, Blake points to circumstances surrounding defendants' simultaneous investigation of the Diaz homicide to support his claims. Specifically, Garner claims that he was pressured by police to falsely implicate another individual named Rubin Ortega in the Diaz homicide in the same manner as he alleges occurred with Blake in connection with the Denny/Felix homicides. Thus, as discussed *infra*, Blake contends that the defendants' alleged misconduct with Garner in connection with the Diaz homicide is substantially intertwined with the events relating to Blake.

According to Garner, on June 25, 1990, Garner went to the 75th PDS to inquire about James Crosby's ("Crosby") sentence in a case that Detective Race and Brew had worked on, where Garner was a kidnap victim. (Garner Dep. at 9.) Garner testified at his deposition that, while he was there, Race asked Garner whether he heard about what had happened on the corner of Ashford and Dumont, to which Garner responded that he "heard that two guys had got killed." (Garner Dep. at 9.) Garner testified that he told Race that he did not know who did it. (*Id*.) Garner also testified that Race first mentioned Blake. (*Id*. at 10.) Race allegedly proceeded to describe the details of the crime, or, according to Garner, "paint[] a picture" for Garner. (*Id*. at 11.) According to Garner, another officer stepped into the room at some point and Race stepped out. (*Id*. at 12.) Blake asserts, based upon police documents, that this second officer was Saurman.[5] Garner testified that he told Saurman that he did not know about the Denny/Felix Homicides, but Saurman continued to question him and discuss his familiarity with Blake. (*Id*.) Saurman then stepped back out of the room and Race entered and closed the door behind him. (*Id*. at 15.) According to Garner, Race then told Garner how the police had helped him with Garner's case, and Race then instructed Garner to help them charge Blake. (*Id*. at 16.)

Garner stated that Race threatened to charge him if he did not help them. (*Id*. at 17.) Garner understood that Race wanted him to repeat the details regarding Blake's alleged involvement in the Denny/Felix Homicides. (*Id*. at 19.) Eventually, Race stepped out and Garner repeated the details to Saurman. (*Id*. at 23.)

Race and Saurman deny engaging in this alleged misconduct. According to defendants, Saurman had never previously spoken to Garner before taking his statement on June 25, 1990, and Garner told Saurman that he was on his way to a store when he saw Blake at the intersection of Dumont and Cleveland Street and was advised by Blake "to get off the block because something is getting ready to go down." (Saurman Dep. at 127; Defs.' Ex. D.) According to defendants, Garner identified Blake as the perpetrator of the Denny/Felix homicides and told Saurman that he saw a car backing down the block, with Blake "running along side . . . firing shots into the car . . . until he ran out of bullets." (Defs.' Ex. D.)

After taking Garner's statement, Saurman and another detective took Garner to the King's County District Attorney's Office to provide a taped statement. (Defs.' 56.1 Stmt ¶ 25.) With Saurman present, Garner gave a taped statement to an ADA about the Denny/Felix Homicides (hereinafter, "Garner DA Statement"). (Defs.' 56.1 Stmt. ¶ 26.) Garner told the ADA that Blake ran alongside the car as it was moving backwards and started shooting an "Uzi" into the car from the passenger's side.[6] (Defs.' 56.1 Stmt. ¶ 27.)

---

[5] Although Garner's testimony demonstrates that he does not remember which officer stepped into the room at that point, Blake points to a DD-5 from that interview that indicates that it was Saurman who took Garner's statement that day. (Pl.'s 56.1 Stmt. ¶¶ 21-24; Defs.' Ex. D.) Therefore, construing the facts most favorably to Blake and drawing all reasonable inferences in his favor, a reasonable jury could conclude that Saurman was the second officer referred to by Garner.

[6] As stated *supra*, plaintiff contends that these facts were previously relayed to Garner by Race.

According to defendants, Carbone did not receive a copy of the Garner DA Statement or the underlying tape. (Carbone Dep. at 246.) Though Garner testified that he knew Carbone, having had conversations with him regarding the kidnapping case[7] (Garner Dep. at 93), Carbone testified that he first encountered Garner on June 26, 1990. (Carbone Dep. at 221-222.)

### 4. Arrest of Blake

On June 26, 1990, at approximately 10:00 p.m., Race, Brew, Saurman, and another detective asked Blake to accompany them to the 75th Precinct. (Defs.' 56.1 Stmt. ¶¶ 29-30; Pl.'s 56.1 Stmt. ¶ 29.) Carbone was not working on that day and Race called him at home to tell him to come to the 75th Precinct to conduct a line-up for the Denny/Felix Homicides. (Defs.' 56.1 Stmt. ¶¶ 31-32.) That evening, in the presence of Race, Carbone conducted a line-up wherein Garner identified Blake as the perpetrator of the Denny/Felix Homicides. (Id. ¶ 33; Pl.'s 56.1 Stmt. ¶ 33; Wade Hearing Tr., at 23.) According to Garner, the detectives told him to point out Blake, stating, "I know you see him, just go ahead and point him out," reminding Garner that he was "looking in [Blake's] direction . . . leaning in his direction." (Garner Dep. at 31.)

On June 26, 1990, with Carbone present, Blake was interviewed by two ADAs. (Defs.' 56.1 Stmt. ¶ 34; Defs.' Ex. I.) Blake told the ADAs that he was at work at a place called Religious Supplies on June 18, 1990, the day of the shooting, and was at lunch at the time of the shooting. (Defs.' 56.1 Stmt. ¶ 35; Defs.' Ex. I.) Blake informed them that he was working with his boss, Bob, as well as Yvette and Dorothy, on the day of the shooting. (Defs.' Ex. I.) He also stated that he had lunch at his sister's house, provided the address, and said that his sister, her daughter, and the sister's boyfriend were present. (Id.)

The Blake scratch sheet indicates that the DA's Office authorized Blake's arrest on June 26, 1990. (Defs.' 56.1 Stmt. ¶ 36.) However, the Deputy Chief in the Homicide Bureau at the time of the incident testified that the police did not need the DA's authorization, but might discuss whether there was sufficient evidence to make an arrest. (Besunder Dep. at 152.) Blake was arrested and charged with Murder in the Second Degree. (Defs.' 56.1 Stmt. ¶ 37.) He remained in pretrial detention from that date until his trial in March 1991.

On June 27, 1990, Carbone interviewed Blake's boss, who told Carbone that on the date of the incident, Blake worked for him, clocked out for lunch, and then returned. (Carbone Dep. at 294.)

### 5. Garner Speaks with Brew About Ortega

Also on June 27, 1990, at approximately 5:00 p.m., Brew took a statement from Garner about the Diaz murder. (Defs.' 56.1 ¶ 40.) During that interview, Garner identified Ortega and Alejandro Ortiz as the Diaz homicide shooters.[8] (Defs.' 56.1 Stmt. ¶ 41.)

---

[7] Defendants point out, however, that the kidnaping, and conviction of Crosby in connection with the kidnaping, occurred in April and May 1989, while Carbone did not begin working at the precinct until July 1989. (Defs.' Reply Mem. at 22 n.16.)

---

[8] Ultimately, however, Garner later stated that he never saw Ortega shoot anyone. (Garner Dep. at 33.)

According to Garner, the following police misconduct took place during the interview: In the presence of Carbone and Brew, Garner told Race that he had not witnessed the shooting on the morning of June 25 and Race proceeded to feed him details about the Diaz shooting, which Garner knew he was expected to recite during a formal interview. (Garner Dep. at 45.) Race threatened Garner that the 75th Precinct officers would go after him unless he implicated Ortega in the Diaz shooting. (*Id*. at 46.) Though Garner first testified that Race was alone, Garner later recollected that Brew and Carbone were allegedly present when Race made those threats. (*Id*. at 47.) Garner then gave a statement implicating Ortega in the Diaz homicide using details that had been fed to him and identified Ortega as the Diaz shooter from a photo array and a subsequent lineup. (Garner Dep. at 33-35, 44-49, and 56-57.)

On June 28, 1990, Brew interviewed Ricardo Betances, a non-fatal victim of the shooting in which Diaz was killed, who corroborated Garner's identification of Ortega.[9] (Defs.' 56.1 Stmt. ¶¶ 43, 44; Pl.'s 56.1 Stmt. ¶¶ 43-44.)

6. Grand Jury Proceeding Against Blake

An ADA elicited Carbone's testimony before the Blake Grand Jury regarding the line-up Carbone conducted on June 26, 1990 in which Blake held the number four position, and testified that he placed Blake under arrest. (Defs.' 56.1 Stmt. ¶¶ 45-46.) The ADA also elicited Garner's testimony before the Blake Grand Jury. (*Id*. ¶ 47.) Garner testified,

stating for the first time, that his girlfriend was with him at the Crime Scene when he observed Blake with an Uzi. (Defs.' 56.1 Stmt. ¶ 48.) Garner also testified that Blake approached him and advised him to, "'Do me a favor and step down the block.' Because something was getting ready to go down." (*Id*. ¶ 49.) Garner stated that he saw a car "back up down Ashford Avenue into Dumont" and that "as the car got to the corner, . . . Blake opened fire at the car." (*Id*. ¶¶ 50-51.) He further testified that "as the car was going back, . . . Blake was running alongside the passenger side of the car, continuing to shoot . . . [in] the direction of the car" and that "he was shooting to [sic] the passenger side of the car . . . into those windows." (*Id*. ¶¶ 52-53.) Garner testified that there were two occupants and that "a friend . . . by the name of Felix . . . was in the passenger side" and that "they were shot up very bad." (*Id*. ¶ 54.) He also testified regarding the line-up he viewed on June 26, 1990, in which he recognized Blake, who was holding number four, as "the shooter at the scene." (*Id*. ¶ 55.)

7. Blake's Criminal Trial

Blake was indicted on or about August 1, 1990 for, *inter alia*, Murder in the Second Degree. (Defs.' 56.1 Stmt. ¶ 56.) In the trial of *People v. Jeffrey Blake*, Indictment No. 7376-90 ("Blake Trial"), Garner was called to testify as a witness for the prosecution; neither Carbone, Race, Saurman, nor Brew were called to testify. (*Id*. ¶¶ 57-59.) Garner testified that he was staying at his grandmother's house on June 19, 1990, at the time he had witnessed Blake commit the Denny/Felix homicides. (*Id*. ¶ 60.) He also testified that his cousin, Otis Garry ("Garry"), also lived with their grandmother on that date. (*Id*. ¶ 61.)

---

[9] Betances did not identify Ortega as the shooter when first interviewed by Saurman and another detective while he was in the hospital. (Pl.'s Ex. KK.)

Garry, a member of the Army National Guard, testified that whenever Garner was in New York, he stayed at Garry's house and that Garner was not staying with Garry on June 18, 1990. (*Id.* ¶ 62.) Garry testified that the first time he saw Garner after the Denny/Felix homicides was three days to one week later. (*Id.* ¶ 63.) According to Garry, after Garner arrived at his home, everyone in the house and in the neighborhood was talking about the Denny/Felix homicides, and that he himself discussed the homicides with Garner after he arrived. (*Id.* ¶ 64.)

Garry testified that the grocery store that Garner said he visited just before he encountered Blake on the afternoon of June 18, 1990, was only open from midnight until 7:00 a.m. (*Id.* ¶ 65.) He also testified that he and Garner had a verbal confrontation in the DA's office during the Blake criminal trial, in front of an ADA and two detectives employed by the DA, during which Garner admitted that he had lied to the DA and to the Grand Jury when he identified Blake as the shooter in the Denny/Felix Homicides. (*Id.* ¶ 66.)

Blake's criminal defense counsel, Howard Kirsch ("Kirsch"), stated in his summation to the jury that Garner was a liar not only for the reasons given by Garry, but also because Garner (1) was an admitted drug dealer who had been arrested and convicted in North Carolina several times, (2) was a convicted felon who was then serving time in jail in North Carolina, and (3) had gone to a mental institution for an evaluation to see if he was telling the truth. (*Id.* ¶ 67.) Kirsch told that jury that Garner (1) could not remember what he had told the DA or the Grand Jury, at or about the time of the double homicide, (2) had testified that the shooting took place on the passenger side, when the evidence showed that the gun likely was fired from the driver's side, (3) had testified that he did not know who was in the car, but was on tape telling the DA that "Felix was in the car," and (4) had denied having been convicted of larceny and the possession of stolen property, when a transcript from North Carolina showed that he had been found guilty. (*Id.* ¶ 68.) Krisch stated to the jury, "The Witness is a liar, he's already shown you to be a liar in numerous instances, he cannot be believed, and if you cannot believe him, you cannot go any further." (*Id.* ¶ 69.)

On March 26, 1991, Blake was convicted by a jury of two counts of Murder in the Second Degree and one count of Criminal Possession of a Weapon in the Second Degree. (*Id.* ¶ 95.) On May 23, 1991, Blake was sentenced to two consecutive terms of imprisonment of eighteen years to life on the murder counts and to a concurrent term of imprisonment of five to fifteen years on the weapons count.

8. Blake's Post-Conviction Proceedings[10]

A hearing was held pursuant to N.Y. Crim. Proc. L § 330 ("§ 330 Hearing") on May 23, 1991, in which Blake challenged the verdict rendered against him. (*Id.* ¶ 96.) Blake's § 330 application was denied. (*Id.* ¶ 95.)

On September 25, 1995, the Appellate Division affirmed both the judgment of conviction and the denial of the motion to vacate the judgment of conviction. *People v. Blake*, 631 N.Y.S.2d 430 (N.Y. App. Div.

---

[10] A complete summary of Blake's post-conviction proceedings is contained in the 1998 decision denying his *habeas* petition. *See Blake v. Artuz,* No. 97-CV-4800 (EHN), 1998 WL 564378 (E.D.N.Y. June 17, 1998).

1995). On January 16, 1996, Blake's motion for reargument was denied. On August 21, 1996, Blake's application for leave to appeal to the Court of Appeals was denied. *People v. Blake*, 672 N.E.2d 613 (N.Y. 1996). On October 29, 1997, the Court of Appeals denied Blake's motion for reconsideration. *People v. Blake*, 674 N.E.2d 340 (N.Y. 1997).

On April 11, 1997, Blake filed for a *writ of habeas corpus* in federal court claiming his conviction violated due process on the following grounds: (1) his guilt was not proven beyond a reasonable doubt; (2) the prosecution failed to disclose evidence that was favorable to the defense; and (3) the court deprived the petitioner of his constitutional right to present a defense. On June 17, 1998, that petition was denied. *Blake*, 1998 WL 564378.

On October 29, 1998, a hearing was held pursuant to N.Y. Crim. Proc. L § 440 ("§ 440 Hearing"). (*Id.* ¶ 102.) The DA's Office joined in Blake's application that the conviction be vacated and the indictment dismissed. The ADA, who was the point person in the DA's office in the Blake re-investigation, informed the court that Garner was known to his family as a liar and that his reliability as an eyewitness was non-existent. (§ 440 Hearing Tr. at 3-6; Besunder Dep. at 66.) Although the ADA took no position with respect to Blake's guilt or innocence, he stated:

> I am convinced and we are convinced that Mr. Garner was not a witness to the crime. Again, it would not be that the defendant presented an alibi. I don't know that I can go to the next step and say with certainty as I stand before you that the defendant did not commit the crime but Mr. Garner was

not in a position to have seen it. There was not one shred of evidence that corroborated him and there were things in the record as I see them today that contradicted him.

> \*\*\*

> We consent to the 440 application. We join in the application in light of all of this information and because the indictment itself, the only identifying evidence was what the Court heard at trial or what went before the grand jury were the words of Mr. Garner whose words are suspect, that it is our opinion that this indictment cannot stand and we would either move or join in the application that the indictment be dismissed.

(§ 440 Hearing Tr. at 14, 18.) Blake's conviction was vacated on October 29, 1998, as a result of the § 440 Hearing. (*Id.* at 19.)

### 9. Ortega's Conviction and *Habeas* Petition

Ortega was convicted by a jury of the Diaz murder and sentenced to twenty-five years to life. His appeals in state court were unsuccessful. In August 2000, Ortega filed a petition for *writ of habeas corpus* in federal court in which he argued that he had newly-discovered evidence that his due process rights were violated when Garner testified falsely at his trial. The newly discovered evidence was Garner's recantation of his trial testimony. Garner was now claiming that his trial testimony was fabricated.

The district court held a hearing to determine whether Garner's recantation was truthful. At the hearing, Garner testified that he had not witnessed the Diaz murder and he

was pressured by the police to testify against Ortega. Following the hearing, the court concluded that Ortega failed to prove that Garner was being truthful when he claimed that he did not witness the Diaz murder and lied at the Ortega trial. *Ortega v. Duncan*, 2001 WL 1152805, at *12. In reaching this decision, the district court found that Garner was completely lacking in credibility as a witness and was "a totally compliant witness, who can be led by a questioner virtually wherever the questioner wants him to go." *Id.*

The Second Circuit reversed the denial of the *habeas* petition and remanded the case. *Ortega v. Duncan*, 333 F.3d 102 (2d Cir. 2003). Specifically, the court held:

> We agree with the district court as to Garner's current suggestibility and give deference to its evaluation of the credibility of his recantation. We are nevertheless left with the conviction that the district court erred when it relied upon its credibility analysis to reach the conclusion that because Garner's recantation was not believable, his testimony at Ortega's trial must have been truthful.

*Id.* at 107. Thus, the court concluded that a determination that Garner's recantation was not credible did not preclude a finding that his trial testimony was perjured. *Id.* After finding significant evidence of perjury at Ortega's trial, the court reversed the denial of Ortega's *habeas* petition and remanded the case to the district court to vacate his conviction and order him released unless he promptly received a new trial. *Id.* at 109. Ortega subsequently pleaded guilty to Manslaughter in the First Degree on January 8, 2004, and remains incarcerated. (Defs.' Ex. AA.)

**B. Procedural History**

Blake filed the complaint in this action on October 19, 2001. On February 9, 2006, this case was re-assigned to this Court. On August 11, 2006, defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Oral argument was held on November 20, 2006. Blake was then given the opportunity to submit a sur-reply, addressing certain evidentiary arguments raised by defendants.

**II. DISCUSSION**

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(C); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

Defendants assert a number of arguments in support of their motion for summary judgment. First, defendants argue that no reasonable juror could find in Blake's favor on the core allegation underlying plaintiff's various claims – namely, Sergeant Race and other officers fed facts to Garner and Garner was forced to implicate Blake – because such claims are based solely on Garner's word, which defendants contend has been totally discredited. Second, defendants argue that the Fourth Amendment claims must fail as a matter of law because, among other things, there is not a constitutional right to an investigation, there was probable cause to arrest and charge Blake, and there is insufficient evidence to support the other requisite elements of a malicious prosecution claim. Third, defendants assert that Blake cannot state a cognizable *Brady* claim against the defendants. Fourth, defendants contend that, even if there are disputed issues of fact as to the Fourth Amendment and *Brady* claims, they are entitled to dismissal of the claims under the qualified immunity defense. Fifth, defendants argue that there is insufficient evidence to warrant a trial on the claims for abuse of process, conspiracy, supervisory liability against Race, or failure to intervene liability against the defendants. Finally, defendants argue that the state law claims also should be dismissed for lack of evidence.

As set forth below, with the exception of the abuse of process and negligent infliction of emotional distress claims, there are disputed issues of fact that prevent summary judgment on any of the grounds asserted by defendants.

A. Dana Garner's Credibility

The majority of defendants' motion for summary judgment relies on their argument that no reasonable jury could credit Garner's testimony, making it incredible as a matter of law. As set forth below, under the circumstances of this case, the Court concludes that it cannot, as a matter of law, disregard Garner's testimony, even though his credibility is highly questionable; rather, his sworn statements regarding police misconduct in forcing him to wrongfully implicate Blake, combined with other evidence in the record to which Blake points, are sufficient to create a material issue of fact on this key issue which

cannot be resolved by summary judgment.

As a threshold matter, the Court recognizes that there is substantial evidence in the record bearing negatively on Garner's credibility. For example, a review of the record in this case demonstrates that Garner has lied under oath on numerous occasions. Specifically, it is now known that Garner lied to the grand jury that indicted Blake, and gave false testimony at Blake's trial. Garner also now claims that he lied at the Ortega trial. In addition, Garner signed an affidavit in 1999, in which he recanted his criminal testimony against Crosby, the individual convicted in connection with the kidnaping case. *See Ortega*, 2001 U.S. Dist. LEXIS 15365, at *22 (noting that Garner recanted his testimony against Crosby and Ortega). However, at his deposition in connection with this case, Garner testified that his trial testimony against Crosby was truthful. (Garner Dep. at 80.) Further, the DA's office joined Blake's application brought pursuant to § 440 to vacate his conviction, citing the fact that Garner's family considers him a liar and stating that his "reliability as an eye-witness was non-existent." (Defs.' Ex. X, 3-6; Besunder Dep. at 66.) Particularly noteworthy is the credibility finding by the district court judge ruling on Ortega's *habeas corpus* petition where Garner attempted to recant his testimony against Ortega, stating that detectives fed him facts. The court noted:

> Garner impressed me as a witness who no longer cares about the truth or falsity of his testimony, and much of the substance of his post-recantation testimony (both before me and in state court on the § 440 motion) depended on which attorney questioned him last. . . . Garner is making it up as he goes along.

*Ortega*, 2001 U.S. Dist. LEXIS 15365, at *37-*38. Though the Second Circuit ultimately reversed the district court, holding that the district court improperly focused on the credibility of Garner's recantation instead of focusing on whether Garner's trial testimony was perjured, the Court "agree[d] with the district court as to Garner's current suggestibility and [gave] deference to its evaluation of the credibility of his recantation." *Ortega*, 333 F.3d at 108.

The standard rule is that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, in *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005), the Second Circuit recognized that there is a narrow exception to this well-established rule in the "rare circumstances" where the sole basis for the disputed issues of fact are statements by the plaintiff, which are so lacking in credibility that no reasonable juror could find for the plaintiff. In affirming the dismissal of the plaintiff's suit on summary judgment, the Second Circuit explained:

> [W]e hold that the District Court did not err in granting defendants' motion for summary judgment on the basis that [plaintiff's] testimony – which was largely unsubstantiated by any other direct evidence – was "so replete with inconsistencies and improbabilities" that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.

*Id*. at 505 (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 475 (S.D.N.Y. 2003)); *see also*

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) (holding that the post-trial sworn statements of the president of plaintiff corporation did not create a factual issue because "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony"); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975) (holding that plaintiff failed to create an issue of fact where plaintiff's affidavits conflicted with plaintiff's earlier deposition); *Schmidt v. Tremmel*, No. 93-CV-8588, 1995 U.S. Dist. LEXIS 97, at *10-*11 (S.D.N.Y. Jan. 6, 1995) (finding no genuine issues of material fact where "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [plaintiffs] complaint or in her subsequent missives to the court"); *Ward v. Coughlin*, No. 93-CV-1250 (FJS) (RWS), 1995 U.S. Dist. LEXIS 21297, at *11 (S.D.N.Y. 1995) (finding plaintiff's self-serving affidavit incredible as a matter of law); *Price v. Worldvision Enters., Inc.*, 455 F. Supp. 252, 266 n.25 (S.D.N.Y. 1978) (addressing affidavit of party).

In the instant case, defendants rely on *Jeffreys* and a number of the other above-referenced cases to support their argument that this Court should grant summary judgment where only the unsubstantiated testimony of one witness supports Blake's case. As an initial matter, *Jeffreys* and these other cases are distinguishable from the instant case because they involved a court declining to credit the unreliable testimony of a *party* to the lawsuit, as opposed to a *witness*. Defendants have failed to cite any case where a court has extended the holding of *Jeffreys* to disregard the testimony of a non-party witness in a summary judgment motion on credibility

grounds. Nevertheless, the Court is willing to assume that *Jeffreys* could be extended to exceptional circumstances where a witness' testimony is so fanciful and lacking in any corroboration that it could be insufficient to create an issue of fact because no rational jury could believe it. This lawsuit, however, is not such a case. As set forth below, applying the *Jeffreys* analysis to this case, the Court finds that there is sufficient evidence in the record, drawing all inferences in Blake's favor, to create a material issue of fact as to whether Garner was fed facts and coached to falsely state that he had witnessed Blake commit the crime.

Here, Blake not only relies on Garner's testimony regarding the alleged police misconduct, but rather seeks to corroborate his testimony by pointing to other evidence in the record. In particular, Blake makes the following arguments regarding additional evidence to support his claim that Garner was coached and pressured to falsely implicate Blake:

(1) Garner was in North Carolina on the day of the Denny/Felix homicides and, therefore, could not have independently known the extensive details about the crime he stated to Saurman and the prosecutor on June 25, 1990, and thereafter, unless such facts were fed to him by the defendants, especially because such details were not publicized in the press or the community.

(2) Garner allegedly volunteered the detail that he observed the shooter fire into the passenger side of the car, which was consistent with the opinion of the CSU at the time, but, according to other evidence cited by Blake,

turned out later to be wrong. Specifically, Blake notes that the only actual eyewitness to the shooting, Celenti, stated that the shooter fired into the driver's side, which was consistent with the medical examiner's opinion that the bullets came from the left side.

(3)  Officers should have questioned Garner's credibility from the very beginning because: (i) Garner gave his statement implicating Blake in the Denny/Felix homicides at 2:00 p.m. on June 25, 1990, which was only 10 hours after the Diaz homicide, and (ii) Garner did not mention during that interview about the Denny/Felix homicides that he had just witnessed the Diaz homicide, but rather mentioned on June 27 for the first time that he had witnessed Ortega commit the Diaz homicide.

(4)  Brew testified at his deposition that Race, who was his supervisor and colleague, had a reputation among detectives for feeding informants and witnesses details about crimes. Brew further stated that Race had a reputation of referring informants and witnesses to the TIPS hotline so they could collect rewards for information, which is a violation of police procedure because of the risk of kickbacks.

(5)  Dennis Bootle, an NYPD detective sergeant, testified in his deposition that he was asked by the Detective Bureau Special Investigations Unit to review 18 cases that had been closed by exceptional circumstances under the supervision of Race in the 75th Precinct.[11] This unprecedented review displayed various deficiencies in the cases closed by Race, though no formal finding of wrong doing by Race was found.

(6)  Blake's police practices expert Steve Rothlein, who recently retired as the Deputy Director of the Miami-Dade Police Department with over 30 years on the force and was a primary instructor for the International Association of Chiefs of Police, detailed how the defendants failed to employ reasonable investigative techniques in handling this case and concluded, "When this case is evaluated in its entirety, there is no other explanation for the failure to take the basic investigative steps, which were deliberately ignored unless Dana Garner was fed the information he provided and the investigative team knew Garner's information was false." (Pl.'s Ex. G(2), at 15.)

(7)  NYPD Deputy Police Chief Reznick testified that (i) longstanding NYPD policy in 1990 dictated that "every effort should be made to identify and arrest all accomplices to a crime" (Reznick Dep. 33-35), and (2) re-canvassing the area of the crime is "critical" (Reznick Dep. 63). Blake points out that defendants did neither

---

[11]  NYPD policy allows for cases to be closed by exceptional clearance ("EC") where some reason beyond police control prevents the arrest of the offender, such as the death of the perpetrator, denial of extradition or uncooperative complainant.

of these things – namely, the officers here did not try to identify other accomplices even though Garner identified several individuals purportedly involved with Blake in the shooting and the officers did not re-canvass the area of the crime.

According to Blake, this evidence provides substantial corroboration for Garner's testimony that he was fed facts regarding the Denny/Felix homicides and was pressured to falsely implicate Blake in those murders.

With respect to some of this evidence, defendants argue that it is simply entitled to no weight because it proves nothing. For instance, contrary to Blake's contention, defendants assert that there was testimony by Otis Garry at Blake's criminal trial that the Denny/Felix homicides were big news in the neighborhood and everybody in Garner's family was talking about it. Thus, defendants contend that it is unsurprising that Garner knew many details of the murders and no reasonable inference can be drawn that the detectives had fed him such facts. Second, although Blake claims that the defendants fed their "mistaken belief" (based upon CSU Detective Shapiro's opinion) to Garner that the shooter fired into the passenger side of the car, defendants argue that no such reasonable inference can be drawn because there is no evidence that any of the defendant officers communicated with Detective Shapiro at any time during the investigation or knew his opinions before questioning Garner.

With respect to other evidence pointed to by Blake, defendants argue that the Court should not consider it because it is inadmissible and, therefore, cannot be used to create a triable issue of fact. First, defendants argue that Rothlein's expert opinions are inadmissible on a number of grounds, including the following: (1) the existence of probable cause is analyzed under an objective standard by the court and, thus, Rothlein's conclusory statements about intentional misconduct are irrelevant and, in any event, are inadmissible credibility assessments; and (2) purported violations of police procedure "to the extent they even exist in this context, are wholly irrelevant, inadmissible, and cannot be used to create an issue of fact as to the existence of probable cause" (Reply Br., at 9.) In short, defendants contend that "Rothlein opines on irrelevant matters and renders conclusions that are contrary to the law governing probable cause." (Reply Br., at 7.) Second, defendants assert that the testimony regarding Race's reputation among detectives and the NYPD's 2001 EC review both constitute inadmissible character evidence. (Reply Br., at 11-13.) Finally, with respect to Deputy Police Chief Reznick's testimony, defendants argue that he testified as a Fed. R. Civ. P. 30(b)(6) witness, rather than as an expert, and has no knowledge of the incident alleged in the complaint.

The Court need not resolve defendants' evidentiary objections regarding Rothlein's opinions, the testimony regarding Race's reputation, the results of the 2001 EC review, or Reznick's testimony because, even assuming *arguendo* that all such evidence is inadmissible, the Court finds that Blake has pointed to sufficient evidence in the record, including evidence which a jury could reasonably view as potentially corroborating Garner's testimony, to create an issue of fact as to whether Garner was fed facts and pressured to falsely implicate Blake.[12]

_____

[12] Blake seeks to strike the declaration of NYPD Assistant Chief Robert J. Giannelli, relied on by defendants in further support of their motion for

Although defendants have pointed to evidence on which a jury could rely to undermine any such claim by Blake through Garner's testimony, the Court must view the record in the light most favorable to Blake and draw all reasonable inferences in his favor. Under that standard, the Court declines to usurp the jury's function of assessing Garner's credibility. Although Garner's prior perjured testimony and the district court judge's prior credibility finding regarding Garner in the *Ortega habeas* petition strongly draw into question Garner's strength as a witness, this Court cannot conclude, as a matter of law under *Jeffreys*, that no reasonable jury could credit Garner's story that he engaged in this false identification of Blake after having been fed facts and pressured by the police. Defendants will have the opportunity to probe Garner's credibility at trial, and it will be within the discretion of the jury to determine what weight, if any, to give his testimony.[13]

## B. The Fourth Amendment Claims

Defendants argue that Blake's Fourth Amendment claims must fail as a matter of law on a number of grounds. First, with respect to the false arrest claim, defendants argue that there was probable cause to arrest Blake. Second, defendants contend that Blake cannot sustain a malicious prosecution claim because (a) defendants did not initiate Blake's prosecution, (b) there was probable cause for the prosecution, and (c) there is no evidence that defendants acted with malice. As set forth below, the Court finds these arguments unpersuasive.

---

summary judgment in response to Blake's characterization of the deposition testimony of Reznick and Bootle. However, the Court is not relying on Reznick's testimony or the EC review in concluding that summary judgment is unwarranted, and because Giannelli's declaration does not change the Court's analysis of this case, the Court need not rule on Blake's evidentiary objection at this time

[13] Defendants also argue that a collateral estoppel type theory supports their argument that Garner's testimony is incredible as a matter of law. Specifically, defendants argue that the credibility of Garner was at issue and fully litigated in plaintiff's state court appeals and federal *habeas* petition, as well as the petition of Ortega, and that plaintiff should be estopped from relying on Garner as a basis for any claims in the present action. (Defs.' Mem. at 45.) Defendants cite no cases, and the Court is not aware of any cases, where the doctrine of collateral estoppel has applied to the credibility of non-party witness

---

testimony. The facts in this case are markedly different from those cases where collateral estoppel bars witness testimony in the criminal context where the jury returns a not guilty verdict on the first of one or more severed counts. *See, e.g., United States v. Jackson*, 778 F.2d 933, 941-42 (2d Cir. 1985) (recognizing that "[t]here are . . . cases applying a principle that would forbid the Government's use, at a second trial, of a witness who has necessarily been found to be incredible at the first trial," but refusing to invoke the principle in that case). The theory in those cases is that to allow such testimony would be akin to subjecting criminal defendants to double jeopardy. The reasoning and principles do not apply to the instant case. Further, plaintiff has pointed to evidence in this case, possibly corroborating Garner's story, that was not before the district court judge during the hearing on Ortega's petition. In fact, in contrasting his analysis of the *Ortega* case, the judge noted that Garner's recantation of the testimony against Blake was true, *Ortega*, 2001 U.S. Dist. LEXIS 15365, at *37, and, on appeal, the Second Circuit referred to "Garner's substantiated perjury against Blake." *Ortega*, 333 F.3d at 108. Accordingly, this Court declines to apply a collateral estoppel-esque theory to the judge's findings in the *Ortega* case, as proposed by defendants.

## (1) False Arrest Claim

Blake's claim of false arrest derives from the Fourth Amendment right of an individual to be free from unreasonable seizure, including freedom from arrest absent probable cause. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted); *Caldarola v. Calabrese*, 298 F.3d 156, 161 (2d Cir. 2002). Defendants argue that the arresting officers had probable cause to arrest Blake. As set forth below, after a careful review of the record, the Court finds that this material issue of disputed fact cannot be resolved on summary judgment as to any of the defendants.

To prevail on a claim of false arrest, a plaintiff must prove the following four elements: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not contest the confinement, and (4) the confinement was not otherwise privileged." *Broughton v. N.Y.*, 335 N.E.2d 310, 314 (N.Y. 1975); *see also Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 334 (E.D.N.Y. 2006). In the instant case, defendants argue that the arrest was privileged because it was supported by probable cause. "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under Section 1983." *Weyant*, 101 F.3d at 852 (2d Cir. 1996) (citing *Broughton*, 37 N.Y.2d at 458 (holding that under New York law, "justification may be established by showing that the arrest was based on probable cause"); and *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.")). A determination of probable cause to arrest is based upon the "totality of the circumstances," *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1982)), and is established "when the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Singer*, 63 F.3d at 119 (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir. 1993) (citation omitted)); *Weyant*, 101 F.3d at 852 (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9, (1979)) (additional citations omitted). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers . . . or may require a trial if the facts are in dispute." *Weyant*, 101 F.3d at 852 (citations omitted). Where an issue of probable cause is "factual in nature," it must be presented to a jury. *See Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994).

As discussed in detail *supra*, this Court has declined to usurp the jury's function and find Garner incredible as a matter of law. Instead, the Court found that Blake has raised a material issue of fact as to whether Garner was fed facts and pressured to falsely implicate Blake prior to his arrest. Given that Garner was the only witness linking Blake to the homicides, such an issue of fact obviously precludes summary judgment on the issue of probable cause. However, defendants correctly argue that this issue must be considered against each defendant separately and defendants question whether Blake has alleged sufficient involvement by each of the defendant officers to survive summary judgment. After reviewing the evidence against each officer, the Court concludes that Blake has met his burden as to each

defendant.

In analyzing the potential liability of each individual defendant, the Court must also consider whether, even if they were not directly involved in the alleged feeding of facts to Garner and the alleged pressuring of Garner to implicate Blake, the defendants may still be liable for participating in an arrest that they allegedly knew lacked probable cause because it was based on false information or for their failure to intercede in another officer's alleged unconstitutional arrest of Blake. It is well-settled that, if a police officer does not personally participate in a constitutional violation, but witnesses such a violation by other officers, that witnessing officer may be liable for failing to intercede to prevent the constitutional violations of other officers where the officer had reason to know such a violation was occurring and had a realistic opportunity to intercede. *See Provost v. City of Newburgh*, 262 F.3d 146, 168 (2d Cir. 2001) ("'It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.'") (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)); *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be."); *accord O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988). As set forth below, again viewing the evidence in the light most favorable to Blake and drawing all reasonable inferences in his favor, there was sufficient evidence to create an issue of fact on each defendant as to whether they personally participated in, or furthered, the alleged use of Garner's false information that led to Blake's arrest, or participated in an arrest they knew was

lacking in probable cause. Moreover, even if not directly involved, there is also sufficient evidence to create an issue of fact as to whether they failed to intercede in such a constitutional violation.[14]

With respect to Race, Garner alleges that Race was the person who fed him details about the Denny/Felix homicides and pressured him to falsely identify Blake in the homicides. Thus, there is no question that the evidence pointed to by Blake, if believed, would allow a reasonable jury to find liability on the false arrest claim as to Race.[15] With

[14] Although defendants argue that Blake has abandoned any claims for failure to intercede liability because he failed to address that issue in his opposition papers, the Court declines to deem that theory of liability abandoned. Blake's primary theory of liability is that the defendants were directly involved in the unconstitutional acts, which was the focus of his opposition papers. However, that does not mean Blake is abandoning the claim in the complaint that the defendants can also be liable under a failure to intercede theory. The same evidence outlined by Blake which creates an issue of fact as to the defendants' direct involvement also creates an issue of fact as to failure to intercede liability, even in the absence of direct involvement in the unconstitutional act. Under such circumstances, the failure to specifically argue that point should not be treated as abandonment of such claim or theory of liability.

[15] Because Blake has put forth evidence regarding Race's alleged personal involvement in the fabrication of evidence, Race's argument that he cannot be held liable under a theory of supervisory liability is similarly flawed. To state a claim for supervisory liability under § 1983, plaintiff must demonstrate the personal involvement, in the challenged conduct, of the supervisor. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). There are several ways by which to demonstrate the personal

respect to Saurman, Garner described his role during the interview by Race in which he was directed to falsely implicate Blake. In particular, Blake has put forth evidence that Race and Saurman took turns speaking to Garner such that Race fed Garner facts, left the room, and Saurman then entered and

continued to take his statement in order to have Garner act as an eyewitness, implicating Blake.[16] Specifically, Garner testified to the following sequence of events regarding the June 25 interview: (1) Garner told Race he did not know anything about the murder; (2) Race mentioned Blake and gave Garner details about the murder; (3) Saurman entered the room and then he and Race stepped out and spoke outside the room; (4) Saurman re-entered the room, asked Garner about the Denny/Felix homicides, and Garner replied that he knew nothing; (5) Saurman brought up Blake and Garner stated that he did not know if Blake was capable of the crime; (6) Saurman stepped out to speak to Race; (7) Race walked back in the room alone and threatened Garner if he did not implicate Blake and instructed Garner to remember what Race had told him about the details of the crime; (8) Race stepped out of the room and Saurman entered again; and (9) Race then implicated Blake in the murder, providing Saurman with the details that had been fed to him by Race. (Garner Dep. 10-30.) Assuming that Garner's testimony is true, there is sufficient evidence to create an issue of fact as to Saurman's alleged knowing participation in obtaining a false statement from Garner to provide probable cause for Blake's arrest. Thus, this Court cannot grant summary judgment in favor of defendants Saurman or Race on the claim of false arrest.

involvement of a supervisory defendant:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 2005). Here, plaintiff has put forth sufficient evidence to create an issue of fact as to Race's direct participation in the alleged constitutional deprivation or, at a minimum, as to whether he was grossly negligent in supervising subordinates engaged in such acts. In addition, Race is not entitled to qualified immunity on this claim on summary judgment. A theory of supervisory liability was clearly established at the time of the events underlying this case, *see Meriwether v. Coughlin*, 879 F.2d 1037, 1047 (2d Cir. 1989), and, if it is proven that Race participated in a scheme to frame Blake by feeding Garner facts and pressuring him to falsely implicate Blake, he would not be entitled to qualified immunity. Thus, the supervisory liability claim as to Race cannot be dismissed on summary judgment. For the same reasons, defendants' motion as to the pendent state claims of negligence and gross negligence against Race is denied.

---

[16] Defendants assert that there is no evidence to suggest Saurman was the detective who was coming in and out of the room during the alleged fact-feeding session. However, the DD-5, summarizing Garner's statement is signed by Saurman, indicating that Saurman participated in taking the statement. (Defs.' Ex. D.) As noted *supra*, drawing all reasonable inferences in Blake's favor, a reasonable factfinder could conclude that the second detective interacting with Race during the interview was Saurman.

Defendants also argue that, even taking Garner's testimony as true, the false arrest claim must be dismissed against Carbone. Specifically, defendants argue Carbone had probable cause to arrest Blake because, according to defendants, there is no evidence that he knew about the alleged fact-feeding by Race. Although there is no evidence that Carbone was present during the initial taking of the statement from Garner by Race/Saurman, Carbone was the lead detective on the case.[17] Blake argues that the jury can reasonably infer from Carbone's alleged failure to take basic investigatory steps in the investigation into the Denny/Felix homicides, as well as his willingness to proceed with the arrest based soley on Garner's statement with its clear credibility issues, that Carbone was a willing participant in the intentional use of Garner's fabricated testimony implicating Blake. Although defendants dispute the reasonableness of such inferences, Blake also has pointed to more direct evidence of Carbone's alleged involvement in this misconduct. Specifically,

Carbone was called to the 75th PDS to conduct the lineup and was present at such lineup, during which Garner claims he was instructed to point out Blake. Garner has stated that, during the line-up that included Blake, one of officers (although he could not recall which one) told him to "just point out Jeffrey Blake." (Garner Dep. at 31.) According to Garner, when he hesitated, he was told, "I know you see him, just go ahead and point him out," reminding him that he was "looking in his direction . . . leaning his direction, just go ahead and point him out ." (*Id.*) Garner claims he then identified Blake as the shooter in the Denny/Felix homicides. (Garner Dep. 30-31.) Thus, there is sufficient evidence in the record through Garner and reasonable inferences to be drawn from other evidence which create an issue of fact as to whether Carbone was a knowing participant in Blake's alleged false arrest without probable cause.

With respect to Brew, Blake points to evidence in the record and argues that it supports a reasonable inference that Brew also was involved in, or at least aware of the alleged feeding of facts to Garner and pressure to falsely implicate Blake, and then participated in Blake's arrest knowing that it lacked probable cause. Specifically, Blake points to the following: (1) Brew was the lead detective responsible for the simultaneous investigation of the Diaz homicide; (2) on June 24, 1990, Brew told Garner to come to the precinct; (3) when Garner came to the precinct the next day, Brew spoke with him before handing him off to Race and Saurman; (4) prior to Garner's statement on June 25, Saurman had just returned from interviewing Betances (who was a victim injured during the Diaz homicide) at the hospital and Betances could not identify his assailant at the time; (5) Brew reviewed Garner's and Betances'

---

[17] The Court has not overlooked the authority that provides that the collective knowledge doctrine cannot be used to impute knowledge from one officer to another. *See Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (stating that the collective knowledge doctrine "*cannot* be used to impute to an officer 'facts known to some [other] member of the police force which exonerate an arrestee'") (quoting *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986)) (alteration in original). Here, the Court is not *imputing* Race's alleged knowledge to the other officers. Rather, as discussed *infra*, drawing all reasonable inferences in favor of plaintiff, the Court holds that there is sufficient evidence to create a triable issue of fact as to whether Carbone, Saurman, and Brew had the same knowledge of the facts regarding the falsity of Garner's statement that Race is alleged to have had.

statements; and (6) Brew was involved in the arrest of Blake on June 26. In addition, Blake points to other evidence after Blake's arrest which he contends shows that Brew was part of the conspiracy from the beginning to knowingly use false information from Garner to implicate Blake in the Denny/Felix murders and Ortega in the Diaz murder. In particular, Blake points to June 27 (the day that Garner picked Blake out of a line-up), when Brew allegedly saw Garner meeting with Carbone on the Blake investigation and interrupted that conversation to ask Garner to speak with him about the Diaz investigation. During that subsequent interview, Garner identified Ortega in the Diaz murder. Garner claims that during that June 27 interview, in the presence of Brew and Carbone, Garner told Race he had not witnessed the Diaz shooting, Race fed him details about the Diaz murder (just as he had allegedly done on June 25 regarding the Denny/Felix homicides), and threatened him unless he implicated Ortega in the shooting, which Garner proceeded to do. Brew then re-interviewed Betances on June 28, who identified Ortega for the first time. In other words, Blake argues that this alleged misconduct by Brew with Race on the simultaneous Diaz investigation, even though it occurred after Blake's arrest, is relevant to the false arrest claim because it supports a reasonable inference that Brew was also involved in, or failed to intercede, in the use of false information from Garner to arrest Blake without probable cause on June 25.

In short, crediting Garner's version of the events and drawing all reasonable inferences in Blake's favor, the Court concludes that Blake has created an issue of fact as to whether each of the defendants personally participated in, and furthered the use, of false information by Garner implicating Blake, or participated in Blake's arrest knowing that it

lacked probable cause. Moreover, at a minimum, there is sufficient evidence to create an issue of fact as to whether they failed to intercede in such a constitutional violation. In other words, even if Race is the only defendant that Blake is able to prove fed facts to Garner and pressured him to lie, there is evidence in the record as to the other defendants – such as (1) Saurman's alleged participation in the initial June 25 interview of Garner with Race during which Garner claimed he was pressured to lie, (2) Carbone's alleged presence at the subsequent line-up during which Garner alleges he was told to pick out Blake, and (3) Brew's alleged simultaneous use of Garner to falsely implicate Ortega in the Diaz murder and his involvement in Blake's arrest – to create an issue fact as to whether the other defendants failed to intervene in Race's constitutional violation.

Accordingly, the Court finds that there are issues of fact regarding probable cause to arrest Blake as to each of the individual defendants that precludes summary judgment.

(2) Malicious Prosecution Claim

"A malicious prosecution claim under New York law requires the plaintiff to prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (internal quotation marks omitted)). Defendants argue that the DA, not the officers, initiated the prosecution, thus breaking the causal connection between defendants and the prosecution, that there was

21

probable cause for commencing the proceedings, and that there is no evidence of malice. The Court disagrees.

First, defendants cannot hide behind the decision of the DA to prosecute when it was defendants who allegedly fed the facts to Garner, thereby providing the unknowing DA with what may be considered a fabricated eye-witness, who made the line-up identification and provided testimony. *See, e.g., Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000) ("[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty."); *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial – none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision."). Given these allegations, the involvement of the DA's Office in the charging decision does not entitle defendants to summary judgment.

As to probable cause, the Second Circuit has noted that the presumption of probable cause created from a grand jury indictment "may be rebutted by evidence of various wrongful acts on the part of the police: 'If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006) (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1251 (N.Y. 1983)). Here, as discussed *supra*, plaintiff has

put forth sufficient evidence to create a material issue of fact as to whether the indictment was produced by fraud and police misconduct.

For the same reason, there is also an issue of fact as to whether defendants acted with malice. Under New York law, actual malice "does not require a plaintiff to prove that the defendant was motivated by spite or hatred," but that he initiated the criminal proceeding "due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Rounseville v. Zahl*, 13 F.3d 625, 629-30 (2d Cir. 1994). Actual malice typically is shown by circumstantial evidence, including a lack of probable cause. *Martin v. City of Albany*, 364 N.E.2d 1304, 1307 (N.Y. 1977). New York courts have held that, while

> lack of probable cause to institute a criminal proceeding and proof of actual malice are independent and indispensable elements of a malicious prosecution action, the absence of probable cause does bear on the malice issue. . . . A jury may . . . infer the existence of actual malice from the absence of probable cause.

*Maxwell v. New York*, 554 N.Y.S.2d 502, 505 (N.Y. App. Div. 1990) (internal citations omitted); *Rounseville*, 13 F.3d at 631 (noting that under New York law, actual malice and lack of probable cause are closely related); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the lack of probable cause – while not dispositive – tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.") (internal quotation omitted); *Mesiti v. Wegman*, 763 N.Y.S.2d 67, 70 (N.Y. App.

Div. 2003) ("[T]he jury was able to 'infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding.'") (quoting *Martin v. City of Albany*, 364 N.E.2d 1304, 1307 (N.Y. 1977)). Here, Blake not only proffers circumstantial evidence of malice due to an alleged lack of probable cause, but also argues malice through direct evidence from Garner that one or more of the defendants engaged in intentional misconduct by pressuring Garner to implicate him, and feeding him details of the homicides, even though they did not believe in Blake's guilt. Under such circumstances, there is an issue of fact on the element of malice.

Accordingly, defendants' motion for summary judgment on the malicious prosecution claim on the above-referenced grounds is denied.[18]

---

[18] Though not specifically alleged in the complaint, except under the more general guise of "deprivation of due process," in the motion for summary judgment, the parties briefed the issue of whether plaintiff has an independent claim for failure to investigate. Here, Blake alleges a constitutional claim for failure to investigate asserting there are narrow circumstances under which such a claim is available. However, this proposed claim appears to be based on an alleged general deprivation of due process. The Supreme Court has announced that "'[w]here a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.)). As discussed in detail *supra*, Blake's claims are covered by the Fourth Amendment. Accordingly, these allegations of a failure to investigate do not create an independent

### (3) Qualified Immunity

Defendants also contend that they are immune from suit on the Fourth Amendment claims under the principle of qualified immunity. As set forth below, the Court finds this argument unpersuasive where the disputed issue is the alleged fabrication of evidence – including allegedly feeding facts to a key witness and pressuring the witness to implicate the Blake – to establish probable cause.

Police officers "generally are shielded from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A government actor may be shielded from liability for civil damages if "his conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to

---

due process claim, but instead are properly regarded as part of plaintiff's false arrest and malicious prosecution claims. Thus, the Court finds no independent claim for failure to investigate. *See Cambell v. Giuliani*, No. 99-CV-2603 (JG), 2000 U.S. Dist. LEXIS, at *12 (E.D.N.Y. Feb. 16, 2000) ("allegations of an officer's failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution"). The Court understands, however, that Blake may seek to introduce evidence regarding defendants' alleged failure to investigate in an effort to prove, among other things, the defendants' alleged malice as it relates to the malicious prosecution claim – namely, that the alleged failure to investigate shows that the defendants knew Garner's statement was false. Evidentiary issues regarding the use of such evidence for any such purpose will be addressed at trial.

believe that his conduct did not violate plaintiff's rights." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant*, 101 F.3d at 858 (internal quotation marks, citation and alterations omitted). "The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). Thus, an arresting officer is entitled to qualified immunity on a claim of arrest without probable cause and of malicious prosecution if either: (a) it was objectively reasonable for the officer to believe that probable cause existed; or (b) officers of reasonable competence could disagree on whether the probable cause test was met. *See O'Neill v. Town of Babylon*, 986 F.2d 646, 649-50 (2d Cir. 1993); *see also Lennon v. Miller*, 66 F.3d 416, 424-25 (2d Cir. 1995)*; Golino*, 950 F.2d at 870.

The Court acknowledges that "the issue of the reasonableness of an arrest or a search for purposes of a Fourth Amendment inquiry is distinct from the issue of objective reasonableness for purposes of a qualified immunity inquiry." *Provost v. City of Newburgh*, 262 F.3d 146, 168 n.5 (2d Cir. 2001); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that [plaintiff]'s search was objectively legally unreasonable."). In *Anderson*, the Supreme Court held that "it is inevitable that law enforcement officials will

in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable." 483 U.S. at 641.

The Second Circuit has defined this standard, which is often referred to as "arguable probable cause," as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable.

*Cerrone v. Brown*, 246 F.3d 194, 203-03 (2d Cir. 2001) (internal quotations and citations omitted). Moreover, under that standard, "an 'arresting officer is entitled to qualified immunity as a matter of law if the *undisputed facts* and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met.'" *McCllellan*, 439 F.3d at 147-48 (quoting *Robison*, 821 F.2d at 921).

In arguing that they are entitled to qualified immunity, defendants do not contest the existence of a constitutional right; rather,

they argue that reasonable people would disagree about the constitutionality of the officers' actions. However, as discussed *supra*, viewing the evidence most favorably to plaintiff, including drawing all reasonable inferences in his favor, Blake has created a material issue of fact as to whether the defendants participated in the fabrication of evidence to establish probable cause to arrest and prosecute Blake. Under the circumstances of this case, this disputed issue of fact also precludes summary judgment on the issue of qualified immunity. In particular, if those facts are proven, this Court cannot conclude that reasonable officers would disagree on the constitutionality of such conduct. More specifically, in *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997), the Second Circuit held that the district court erred in granting summary judgment in favor of the police officers on qualified immunity grounds with respect to the alleged fabrication of evidence. The Court found qualified immunity unavailable because conspiring to fabricate and forward to prosecutors a known false confession "violates an accused's clearly established constitutional right, and no reasonably competent police officer could believe otherwise." *Id.*; *see also McSherry v. City of Long Beach*, 423 F.3d 1015, 1022 (9th Cir. 2005) (reversing grant of judgment as a matter of law on qualified immunity grounds where plaintiff "raised a disputed issue of fact as to whether defendants fabricated some of the evidence used to obtain [plaintiff's] conviction"); *Kingsland v. City of Miami,* 382 F.3d 1220, 1233 (11th Cir. 2004) (reversing summary judgment on qualified immunity grounds and noting that "because a jury question exists as to whether the defendants constructed evidence upon which to base [plaintiff's] arrest, the question whether arguable probable cause for the arrest existed

is aptly suited for a jury"). Accordingly, the motion for summary judgment on qualified immunity grounds is denied.

## C. The *Brady* Claim

Blake also asserts a Section 1983 claim based upon the defendant police officers alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Blake alleges that the defendants violated *Brady* in several ways, including the following: (1) failing to advise prosecutors that they had fabricated evidence by coercing Garner into falsely implicating Blake in the homicides;[19] (2) failing to advise prosecutors as to the sequence of Garner's statements to the police about the Denny/Felix homicides and the Diaz homicide, which Blake submits would have revealed to prosecutors that Garner had to be lying about his observations; and (3) failing to

---

[19] Defendants argue that the fabrication of evidence is not a *Brady* issue because it is subsumed within other claims. (Defs.' Reply, at 16 n.11.) It is not entirely clear from prior Second Circuit cases whether such a claim should be treated separately from a malicious prosecution claim. *See, e.g., Richardson v. City of New York*, No. 02-CV-3651 (JG), 2006 WL 2792768, at *5 (E.D.N.Y. Sept. 27, 2006) ("whether plaintiff's version of events establishes malicious prosecution, as opposed to a free-standing claim for fabrication of evidence or denial of a fair trial, is a matter of some doctrinal ambiguity") (discussing Second Circuit cases). For example, in *Ricciuti*, the Second Circuit analyzed the "fabrication of evidence" claim separately from the malicious prosecution claim. 124 F.3d at 129-31. However, in *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003), the Second Circuit suggested that the fabrication of evidence allegation in *Ricciuti* was part of the malicious prosecution claim. Because of this ambiguity, this Court has treated them as separate claims for purposes of the summary judgment motion.

inform prosecutors about other information in their possession which would have pointed to other suspects with a motive to commit the murder.

Defendants move for summary judgment on the *Brady* claim on two grounds. First, defendants argue that the information allegedly not disclosed regarding the sequence of Garner's statements to the police regarding the Denny/Felix and Diaz homicides was not "material" to the outcome of Blake's criminal trial. Second, defendants contend that the DA's Office knew all the facts relating to the sequence prior to Blake's trial and, thus, the defendant bears no responsibility for any failure by the prosecutor to reveal such information to Blake.

As set forth below, however, the issue is not so narrow. Blake's core allegation is that the defendants fabricated evidence and concealed that misconduct from the prosecutors, defense, and jury in Blake's trial. The Court has already concluded that there is a sufficient basis in the record, under the summary judgment standard, to allow that issue to be submitted to the jury. Because such misconduct, if proven, would also support a *Brady* claim under Section 1983, summary judgment is also unwarranted on this claim for similar reasons. The more detailed debate between the parties about whether some lesser conduct or concealment by the defendants would be sufficient to support a *Brady* claim, although certainly an important analysis for purposes of evidentiary issues and instructing the jury at trial, does not alter the conclusion that the claim must survive summary judgment based upon the fabrication of evidence allegations that Blake

will be seeking to prove to the jury at trial.[20]

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 93. As the Second Circuit has noted, "*Brady* does not discuss the relative disclosure obligations of police and prosecutor." *Walker v. New York*, 974 F.2d 293, 299 (2d Cir. 1992). However, in *Walker*, the Second Circuit agreed with the line of cases that had held that "the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors." 974 F.2d at 299. The Second Circuit explained the rationale for that rule:

> It is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that must

---

[20] Defendants further claim they are entitled to qualified immunity on these other theories of liability under *Brady*. At oral argument, counsel for defendant stated, "[i]n 1990 . . . it may have been a fact and the law, that inculpatory [sic] and even impeachment material had to be turned over." (Nov. 20, 2006 Oral Argument Tr. at 54.) However, counsel argued there was no *Brady* obligation with respect to the sequence of events regarding Garner's statements. Yet, counsel acknowledged that the ADAs "all . . . testified at there [sic] deposition in 2005 that it was *Brady* material." (*Id.*) The Court concludes, at a minimum, that there are issues of disputed fact regarding whether the exculpatory and impeachment information was turned over, to whom, and in what form that preclude a finding, at this time, that defendants are entitled to qualified immunity.

be disclosed to the defense. A rule requiring the police to make separate, often difficult, and perhaps conflicting, disclosure decisions would create unnecessary confusion. It would also ignore the fact that the defendant's appropriate point of contact with the government during litigation is the prosecutor and not those who will be witnesses against him. Since [plaintiff] has alleged that the police shared all exculpatory evidence with the prosecutors, [plaintiff's] claim against the police relating to the suppression of exculpatory evidence fails to state a claim upon which relief can be granted.

*Id.* Therefore, to the extent Blake attempts to argue that the police had some disclosure obligation beyond providing *Brady* material to prosecutors, *Walker* precludes such an argument.

However, the Second Circuit also has made clear that the fabrication of evidence by police officers and forwarding of such evidence to prosecutors is actionable under Section 1983 and would not be protected by qualified immunity. *See Ricciuti*, 124 F.3d at 130 ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."); *see also Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."); *Walker*, 974 F.2d at

293 (stating that a request to replead allegations that police suppressed evidence from prosecution should be addressed by district court on remand). Other courts have reached the same conclusion. *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006) (affirming district court's denial of qualified immunity and holding that an examiner with the state police could be held liable on a *Brady* claim, which alleges a due process violation, where she suppressed exculpatory evidence); *Taylor v. City of New York*, No. 03-CV-6477 (RLC), 2006 WL 1699606, at *4 (S.D.N.Y. June 21, 2006) (denying summary judgment where disputed issue of fact exists as to whether police fabricated evidence during vehicle stop and subsequent search); *Kidd v. City of Chicago*, No. 02-CV-9534, 2003 WL 22243938, at *2 (N.D. Ill. Sept. 26, 2003) ("Police officers who withhold exculpatory evidence from prosecutors or fabricate inculpatory evidence similarly violate the due process clause and are subject to suit under § 1983.").[21]

---

[21] Defendants also argue that police officers' *Brady* obligations were not clearly established in 1990, entitling defendants to qualified immunity. Specifically, they argue that in 1990 *Brady* obligations were limited to prosecutors, not the police. The Court disagrees. In *Walker*, which dealt with an incident that occurred in 1971, the Second Circuit recognized that *Brady* did create a disclosure obligation on the police, but that such obligation was satisfied where police shared all exculpatory evidence with the prosecutors. 974 F.2d at 299. Thus, the Second Circuit recognized that before 1990, there was a duty on the part of officers to disclose evidence to prosecutors. Indeed, several other circuits had recognized by that time that officer's had an independent duty to disclose such evidence to prosecutors. *See, e.g., Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) ("police officer cannot avail himself of a qualified immunity defense if he procures false

In the instant case, as discussed fully *supra*, Blake has created an issue of fact as to whether the defendants participated in the alleged fabrication of evidence, through Garner's false testimony, which was forwarded to prosecutors to be used in Blake's trial. The circumstances surrounding the use of Garner's testimony in Blake's prosecution also creates disputed issues of fact as to his *Brady* claim and such issues cannot be eliminated by qualified immunity at this stage under the circumstances of this case. Accordingly, summary judgment on the *Brady* claim is denied.

### D. Abuse of Process

Defendants seek dismissal of plaintiff's abuse of process claim. Because plaintiff's opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone.

─────────────

identification by unlawful means or deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles"); *Jones v. City of* Chicago, 856 F.2d 985 (7th Cir. 1988) (finding that officers could be held liable for deliberately concealing and misrepresenting facts from prosecutors); *Hilliard v. Williams*, 516 F.2d 1344, 1349-50 (6th Cir.1975) (holding that allegation that state investigator withheld exculpatory evidence in violation of Brady states § 1983 claim), *vacated on other grounds*, 424 U.S. 961(1976), *on remand*, 540 F.2d 220, 222 (1976) (affirming judgment against investigator); *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964). In addition, defendants do not even attempt to argue that Blake's right to be free from having officers fabricate evidence through the use of a false witness was not clearly established in 1990. Thus, the Court finds that this right was clearly established at the time of the Blake investigation.

*See Bellegar de Dussuau v. Blockbuster, Inc.*, No. 03-CV-6614 (WHP), 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) (finding claim abandoned by virtue of plaintiff's failure to address it in opposition to defendant's summary judgment motion on the claim) (citing *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998)); *see also DeVito v. Barrant*, No. 03-CV-1927 (DLI), 2005 WL 2033722, at *10 (E.D.N.Y. Aug. 23, 2005) (same); *Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); *Arias v. NASDAQ/AMEX Mkt. Group*, No. 00-CV-9827 (MBM), 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003) (dismissing claims as "abandoned" where plaintiff's summary judgment opposition "neither refute[d] nor even mention[ed]" defendant's argument for summary judgment on two of his claims); *see also* Local Civ. Rule 7.1 ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion . . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default.").

Nevertheless, the Court proceeds to consider the substance of plaintiff's claim for abuse of process, and finds it to be without merit. In order to establish liability for malicious abuse of process under § 1983, a plaintiff must establish the claim's elements under state law. *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). Under New York law, "'a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act; (2) with the intent to do harm without excuse of justification, and

(3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'" *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook*, 41 F.3d at 80). Plaintiff's abuse of process claim fails because there is no evidence in the record that defendants aimed to achieve an objective other than plaintiff's prosecution and conviction. *Savino*, 331 F.3d at 77 ("[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution."); *Pierre-Antoine v. City of New York,* No. 04-CV-6987 (GEL), 2006 WL 1292076, at *8 (S.D.N.Y. May 9, 2006) (dismissing plaintiffs' abuse of process claim based on failure to allege or provide evidence of collateral purpose outside legitimate ends of the process); *see also Brewster v. Nassau Cty.*, 349 F. Supp. 2d 540, 550 (E.D.N.Y. 2004) (same); *Curiano v. Suozzi*, 469 N.E.2d 1324, 1327 (N.Y. 1984) ("A malicious motive alone . . . does not give rise to a cause of action for abuse of process.").[22] Accordingly, summary

judgment in defendants' favor on the abuse of process claim is warranted.

## E. Conspiracy

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). Defendants argue that Blake has failed to establish any constitutional deprivations and that his conspiracy claim must necessarily fail. However, as stated *supra*, this Court has found that Blake has set forth sufficient evidence to create a material issue of disputed fact as to whether he suffered an constitutional deprivation. Defendants also assert that there is no evidence that links Carbone, Brew or Saurman to any alleged conspiracy to inflict an unconstitutional injury on Blake. However, again, as discussed *supra*, the Court has found, drawing all reasonable inferences in favor of Blake, that Blake has put forth evidence to overcome a summary judgment motion on the issue of whether Carbone, Brew, and Saurman conspired with Race and Garner to deprive Blake of his constitutional rights by, among other things, having Garner falsely implicate Blake in the murders. Accordingly, summary judgment on this claim is denied.

---

[22] At oral argument, counsel for plaintiff suggested that the defendant officers may have had the improper objective of attempting to deter plaintiff from filing a civil rights lawsuit. Although this would constitute a proper collateral objective and pleading such might allow a plaintiff to survive a motion to dismiss, plaintiff has failed to point to any evidence in the record that supports this theory of collateral objective for the purposes of the instant summary judgment motion. *Anderson*, 477 U.S. at 256 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."); Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the

mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.").

### F. Pendent State Law Claims[23]

The complaint alleges a pendent state claim of negligent infliction of emotional distress as to all defendants. Although defendants moved for summary judgment on this claim, Blake failed to oppose such motion in his papers and appears to have abandoned this claim. In any event, examining the merits below, the Court concludes that there is insufficient evidence in the record from which a factfinder could reasonably conclude that all the elements of such a claim are met.

A claim of negligent infliction of emotional distress "may only proceed where the allegations of conduct are 'so extreme in degree and outrageous in character as to go beyond all possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community.'" *Wilson v. City of New York*, 743 N.Y.S.2d 30, 34 (N.Y. App. Div. 2002) (quoting *Wolkstein v. Morgenstern*, 713 N.Y.S.2d 171, 172 (N.Y. App. Div. 2000) (internal quotations omitted)). Moreover, "'[i]n the absence of contemporaneous or consequential physical injury, courts have been reluctant to permit recovery for negligently caused psychological trauma, with ensuing emotional harm alone.'" *Armstrong ex rel. Armstrong v. Brookdale*, 425 F.3d 126, 137 (2d Cir. 2005) (quoting *Johnson v. State*, 334 N.E.2d 590, 592 (N.Y. 1975)).

> [Although] physical injury is no longer a necessary component of a cause of action to recover damages for the negligent infliction of emotional distress . . . [t]he circumstances under which recovery may be had for purely emotional harm are extremely limited and, thus, a cause of action seeking such recovery must generally be premised upon a breach of a duty owed directly to the plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety.

*Lancellotti v. Howard*, 547 N.Y.S.2d 654, 654 (N.Y. App. Div. 1989) (internal citations omitted). In the instant case, Blake has not pointed to any evidence in the record, nor has the Court found any, from which Blake could establish that he suffered an emotional injury as a result of a breach of duty owed directly to him that endangered his physical safety. Accordingly, plaintiff's claim of negligent infliction of emotional distress is dismissed.

### III. CONCLUSION

For the foregoing reasons, defendants' motion is GRANTED as to plaintiff's abuse of process and negligent infliction of emotional stress claims. Defendants' motion is DENIED as to all other claims as alleged against defendants.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 29, 2007
Central Islip, New York

* * *

---

[23] As noted *supra,* at footnote 15, the pendent state claims against Race for negligence/gross negligence in his supervisory capacity survive summary judgment.

The attorneys for plaintiff are Peter J. Neufeld, Ramzi Kaseem, and Nick J. Brustin, of Cochran, Neufeld & Scheck, LLP, 99 Hudson Street, 8th Floor, New York, New York 10013.  The attorney for defendants is Michael A. Cardozo, Corporation Counsel of the City of New York, by Caryn A. Rosencrantz, Jay Kranis, and Basil Sitaris, 100 Church Street, New York, New York 10007.